THE SAN ANTONIO STREET RAILWAY COMPANY v. H. B. ADAMS ET AL.

No. 153.

**1. Private Corporation—Contract.**

A contract made by a number of stockholders in a corporation, by which they transfer a controlling amount of the stock in consideration of work, etc., is not a contract with the corporation; even though it was stipulated in the contract that the by-laws of the company should be altered, as a part of the contract .................................... 130

**2. Paid up Nonassessable Stock.**

The words *paid up nonassessable stock* have a different meaning from *nonassessable stock.* The latter may mean stock upon which nothing has been paid, although not legal under our State Constitution. But "paid up and nonassessable stock" can only mean stock that is made nonassessable by reason of the fact that the amount for which it calls has been fully paid ............................................... 131

**3. Same—Construction.**

See contract held to obligate the return of stock of the concern actually paid up and therefore nonassessable. Such stock can not be created by vote of board of directors; such action is forbidden by the Constitution of the State, and would be null and void ...................... 131

**4. Board of Directors.**

A director is without authority to act as such in a matter in which his interest is adverse to that of the corporation. It seems that acts of directors so disqualified would not bind the corporation ............. 132

ERROR to Court of Civil Appeals for Fourth District, in an appeal from Bexar County. Chief Justice JAMES, being disqualified, did not sit in the case in Court of Civil Appeals.

*Houston Bros.* and *I. C. Baker*, for appellant.—A corporation can not be held responsible for a contract made between individuals, without consideration to it, by which the majority of the capital stock of the company is simply transferred from one set of individuals to another; and stock issued under such contract, providing that it shall be full paid and

nonassessable, must in fact be full paid to the corporation by some of the parties to the contract before the corporation can be required to treat it as such.

. *Simpson & James*, for appellees.—Where a corporation becomes a party to an arrangement between its promoters or its stockholders who undertake to start the corporate business, and the arrangement is reasonably directed to the means of carrying out the company's authorized pur poses, it is bound by such arrangement.

An arrangement made for the benefit of the corporation, or the result of which enures to the benefit of the corporation, and the promoters or stockholders in the transaction give a valuable consideration or surrender a valuable right to this end, should bind the corporation to the transaction, when the corporation consents thereto or seeks to avail itself of the arrangement. And where stockholders in such transaction surrender their original majority stock and accept from the company in lieu thereof a minority of stock, with the understanding that the latter be deemed paid up and nonassessable in their hands, and by resolution the company declares the same not subject to assessment, and so recognizes it for a great length of time, the corporation itself is estopped to treat it otherwise. 1 Mora. on Corp., sec. 234; Cook on Stock, Stockh., and Corp., secs. 38, 39, 40; Scovill v. Thayer, 115 U. S., 145; Hawley v. Upton, 12 Otto, 314; Phelan v. Hazard, Myers' Fed. Dec., secs. 156, 157; Boone on Corp., sec. 104.

GAINES, ASSOCIATE JUSTICE.—The defendants in error, H. B. Adams, E. D. L. Wickes, and Caroline Kampmann, each brought a separate suit in the District Court of Bexar County against the plaintiff in error, the San Antonio Street Railway Company, to enjoin it from proceeding to forfeit certain shares in the company respectively owned by them, for nonpayment of assessments. By agreement the three suits were consolidated and were proceeded with as one. The following are the facts of the case as shown by the statement of facts:

The company was incorporated by virtue of a special act of the Legislature, approved May 2, 1874, with an authorized capital stock of $200,000, to be divided into shares of $25 each. J. H. Kampmann, Thomas J. Devine, H. B. Adams, and E. D. L. Wickes each subscribed to the stock, the number of their shares amounting in the aggregate to 5200. There were other shares subscribed for, but whether or not the whole number authorized by the charter was taken up does not clearly appear. An assessment of one-fourth of one per cent upon each share was called for, for the purpose of procuring stationery, books, etc., and of defraying the expenses of the charter. No work was done in the construction of the railway until in November, 1877, August Belknap, in behalf of

himself and others, submitted to the subscribers above named a proposition in writing, of which the following is a copy:

"*Messrs. Adams, Wickes, and associates, San Antonio, Texas:*

"GENTLEMEN—After considering your proposition in regard to the stock and charter of the San Antonio Street Railway Company, we have the following conditioned offer to make you, viz.:

"That within sixty days after your acceptance of our offer and compliance with the conditions which we ask from your company and the council, we will begin the construction of the road and push it to completion as fast as may be practicable, provided:

"First.   That you transfer to us $130,000 of the capital stock of the company, of which amount we will issue to you $15,000, which shall be nonassessable.

"Second.   That you amend section 9, article 2; section 1, article 4, and section 4, article 6, of your by-laws so that they will allow a majority of stock to control, and not two-thirds as now provided.

"Third.   That you will complete the records of the company and bring them up in legal form, that we may reorganize the board and elect such new officers as we may choose.

"Should you accept this proposition, a telegram to A. Belknap, Barnes House, Houston, will bring us to the front—that is, to San Antonio.   Our party will remain at Houston until Wednesday evening.

"Yours truly,

[Signed]          "AUGUST BELKNAP AND ASSOCIATES."

The foregoing proposition led to the execution by Belknap of the one part and the above named stockholders, possessing the 5200 shares, of the other, of a written agreement, of which the following is a copy:

"*The State of Texas, County of Bexar.*—This agreement, made and entered into this 22nd day of November, A. D. 1877, by and between H. B. Adams, E. D. L. Wickes, T. J. Devine, and J. H. Kampmann, of Bexar County, Texas, parties of the first part, and August Belknap, of the city of New York, party of the second part, witnesseth:

"That the parties of the first part agree and bind themselves to transfer and deliver to the party of the second part 5200 shares of the capital stock of the San Antonio Street Railway Company at the time and in the manner herein after specified, together with all the books, stationery, etc., including stock books, transfer books, and papers pertaining to or belonging to the said company.

"For and in consideration of the above agreement, the party of the second part agrees and binds himself, and hereby covenants and promises to and with the said parties, to construct, equip, and have in good running order a street railway, commencing on the Alamo Plaza and running thence to the San Pedro Springs, in the city of San Antonio, said work

to be begun within sixty days after the delivery of bond and transfer of stock, etc., as herein before provided, and to be completed to a point opposite to the San Pedro Park Reservation within six months after the work is begun.

"It being understood and agreed, that any and all delays in the construction of the said line of railway occasioned by bad weather, or interruptions by injunctions or other restraining process of the courts at the suit or suits of the city or private individuals or corporations, shall not be computed as a part of the sixty days or six months mentioned.

"The party of the second part further agrees and binds himself to deliver to the parties of the first part a duly executed bond in the sum of $1000, stipulated damages payable to the parties of the first part, their heirs or legal representatives, conditioned for the faithful performance of the stipulations and agreements herein made, to the banking firm of Donnell, Lawson & Co., of New York City; and it is agreed and understood that the transfer and delivery of the stock and other property herein before provided for shall be made by the parties of the first part to the party of the second part, his heirs or legal representatives, or his or their attorneys, upon and at the time of the delivery of said bond.

"The party of the second part further agrees and binds himself to pay to the parties of the first part the sum of $287.50, and to assign and set over to said parties, their heirs or legal representatives, 600 shares of paid up nonassessable stock in said railway company. It being further agreed and understood by and between the parties to this instrument, that the said party of the second part shall be elected, by a vote of the stockholders, president of the said railway company. And it is further agreed and understood, that the stipulations and provisions of this contract shall be considered as confidential, and shall not be disclosed or made public for six months after the completion of the line of road herein provided for, unless it shall become necessary to enforce the carrying out of some one or more of said provisions by the parties hereto in the courts of the country or otherwise.

"Signed in duplicate in the city of San Antonio, this 23rd day of November, 1877.

"It is further agreed and understood by and between the parties hereto, that should the party of the second part fail to comply with the stipulations and agreements herein contained, then and in that case the 5200 shares of stock shall revert to the parties of the first part. This addition made before signing.

[Signed]

"H. B. ADAMS,
"E. D. L. WICKES,
"THOS. J. DEVINE,
"J. H. KAMPMANN,
"AUGUST BELKNAP."

At a meeting of the board of directors of the corporation held on the 27th day of December, 1877, Adams, Belknap, Terrell, and Woodward being present as such directors, the following resolution was passed:

" Resolved, that the original' contract between H. B. Adams, E. D. L. Wickes, Thomas J. Devine, J. H. Kampman, and August Belknap, relating to the transfer of certain stocks to said Belknap and the construction of certain lines of road authorized by the charter, be spread upon the minutes and made a part of the records of this company, which contract reads as follows." Here follows a copy of the contract herein before set out.

In pursuance of this agreement, on the 29th of December, 1877, there were issued to Wickes and to Adams each a certificate for 162 shares of the capital stock of the corporation, and to J. H. Kampmann a certificate for 138 shares. To whom the other certificates were issued at the time does not directly appear, but it does appear that the three certificates above mentioned were in the same form as all others which were issued to the subscribers for the stock. They do not express either that they were paid up or were nonassessable. It was also shown that upon each of the stubs from which the three certificates in question were taken there appeared in the handwriting of Belknap the following statement: "Assessments on this certificate to be paid by A. Belknap."

At the time the agreement in question was entered into, Adams was president and Wickes and Kampmann were directors of the company. It was agreed that at that time the franchise of the company which had been acquired through its charter and the ordinances of the city of San Antonio was worth the sum of $15,000.

Adams testified, that he and the other stockholders considered the stock in question nonassessable, and that they were never called upon for any assessment until those were made which are now at issue. He did not recollect being advised by A. W. Houston and Judge Devine that the company could not legally issue certificates for paid up stock unless the same was actually paid up; and he thought he would have remembered it if such statement had been made.

One Newcomb also testified, that he was a stockholder in and secretary of the company up to the time Belknap took control, and that it was his understanding and that of the other stockholders that the stock in question was nonassessable.

A. W. Houston testified, that he was present when the contract was entered into, and that he advised the parties that the company could not issue nonassessable stock, and that Judge Devine concurred in this advice; that in view of this, the last clause in the contract was added after the date, in his handwriting, as a penalty against Belknap if he should afterwards levy any assessments against the stock; and that they took

the stock with the understanding that Belknap should protect them against any assessments that might be levied, and he told them that he did not intend to levy any assessments, but to build the road with bonds.

At a meeting of the board of directors of the corporation, held on the 20th of October, 1885, and at which Belknap, as president, and two others were present, the following resolution was passed:

"Resolved, that common stock for which certificates were issued and which bear no assessment, be now declared full paid up and nonassessable."

The charter of the corporation requires that the board of directors shall consist of not less than five members.

The corporation was shown to be not insolvent.

The trial court held, that the corporation being solvent, and having recognized the contract of Adams and others of the one part and Belknap of the other, by causing it to be spread upon its minutes, and having accepted the benefits under it, was estopped to deny that it was bound by it, and entered a decree enjoining the assessments. The Court of Civil Appeals took substantially the same view of the question and affirmed the judgment, intimating, however, that if the corporation had been insolvent, and the rights of creditors had been involved, the result of the case would probably have been different.

We concur neither in this opinion nor in the result of the case. The conclusion reached by the courts below is based upon a radical misconception of the contract as we construe it. It does not purport to be a contract between the corporation and Belknap. Adams and his associates merely acted as shareholders possessing a controlling interest in the stock of the corporation, and sought to secure by the agreement not only the completion of the enterprise the company was organized to secure, but also a direct benefit to themselves, not to be participated in by any other stockholder. Some of them were then directors of the company, but it is clear that they did not assume to contract in that capacity. It is true that the undertaking on part of Belknap is made dependent upon certain changes in the by-laws of the corporation; but that undertaking may have been made dependent upon the happening of any other event over which the other parties had no control whatever.

But there is a more important question, which arises upon the face of this contract, and which goes to the very foundation of the right asserted in this suit. The undertaking on part of Belknap in reference to the shares which were to be retransferred by him to the parties of the first part seems to have been treated by the courts below as if it had been provided that he was to assign to them 600 shares of nonassessable stock. The language is "paid up nonassessable stock," which means a very different thing from stock simply nonassessable.

Stock upon which nothing has been paid may be called nonassessable

and may be so treated; not legally, however, under our Constitution. But " paid up nonassessable stock " can only mean stock that is made nonassessable by reason of the fact that the amount for which it calls has been fully paid. The use of the word " nonassessable " in the clause in question is unnecessary in the connection in which it is found; but that is usual, not only in commercial contracts, but also in more solemn writings.

The words " paid up " have a meaning which is precise, and they are not therefore open to construction. Their signification being more specific than that of the word " nonassessable," by no rule of interpretation can they be expunged from the context; and in construing the provision in question they must be given effect.

We are therefore of opinion, that the face of the contract shows clearly that it was the intention of the parties that the certificates in question were not merely to be treated as paid up, but that they were to be paid up in fact. The endorsement upon the stubs tends very strongly to show, that in the opinion of Belknap, the rights of the corporation as against the holders of the certificates were not to be affected by the contract, and that it was his duty to protect the holders against all lawful assessments.

In construing contracts of doubtful meaning, the practical construction of the parties to them may be considered. The construction given by Belknap to the contract in question, shown by his writing upon the stubs, was decidedly against his own interest, and would be entitled to great weight in interpreting the instrument, provided its interpretation were at all doubtful.

Besides, at the time the contract under consideration was entered into the present Constitution was in force. It provides, that " No corporation shall issue stock or bonds except for money paid, labor done, or property actually received; and all fictitious increase of stock or indebtedness shall be void." Const. 1876, art. 12, sec. 6. It is not to be presumed that the parties to this contract intended to stipulate for the doing of a thing that was expressly prohibited by law.

Our conclusion being that Belknap, in agreeing to assign nonassessable stock, undertook to act only for himself and perhaps his associates, and to deliver stock not merely nonassessable, but also stock upon which all assessments had been paid or would be paid by him, we fail to see any question of estoppel in this case. The fact that the board of directors ordered the contract to be spread upon the minutes of their proceedings did not in any manner change its terms. The subsequent resolution passed in 1885, declaring these shares nonassessable, was equally without effect. Such action was practically forbidden by the Constitution, and was void.

Both these resolutions, it seems to us, were void for still another reason. A director is without authority to act as such in a matter in which his interest is adverse to that of the corporation. 1 Mora. on Corp., secs.

517, 518.  Two of the four directors who constituted the quorum when the first resolution was passed were parties to the contract.  When the second was adopted, Belknap himself sat as president, with only two others.  Without the directors who had a direct personal interest in the transaction, there was no quorum at either meeting, and the corporation was not bound.  No other action in reference to the matter was shown until the assessments in controversy were called for.  It appears that the railway was constructed with proceeds of bonds issued by the corporation, and that no previous assessments had been made.  In order to create an estoppel in pais, the party to be estopped must have misled the other by his conduct, and the other must have been induced thereby to change his position for the worse.  We do not find any of these elements of estoppel in this case.

For the reasons given, the judgments given by the District Court and of the Court of Civil Appeals are reversed, and judgment is here rendered for the plaintiff, dissolving the injunction, and for all costs.

*Reversed and rendered.*

Delivered June 7, 1894.